**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

MICHAEL D. KROLL,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-4065-MWB

**REPORT AND RECOMMENDATION**

_____

### *TABLE OF CONTENTS*

*I.*     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

     *A.*    **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
     *B.*    **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
         *1.*    **Introductory facts and Kroll's hearing testimony** . . . . . . . . . . . . **3**
         *2.*    **Kroll's medical history** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
         *3.*    **Vocational expert's testimony** . . . . . . . . . . . . . . . . . . . . . . . . **25**
         *4.*    **The ALJ's decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*III.*   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . . **29**

     *A.*    **Disability Determinations and the Burden of Proof** . . . . . . . . . . . . . . **29**
     *B.*    **The Substantial Evidence Standard** . . . . . . . . . . . . . . . . . . . . . . . . **32**

*IV.*    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

*V.*     **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

## I. INTRODUCTION

The plaintiff Michael D. Kroll ("Kroll") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Kroll claims the ALJ erred in failing to evaluate his mental retardation under the correct legal standard, and in determining he has the physical and mental capacity to work. (*See* Doc. No. 8)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On March 4, 2002, Kroll protectively filed an application for DI benefits (R. 39-41), and on June 17, 2002, Kroll protectively filed an application for SSI benefits (R. 229-35). In both applications, Kroll alleged a disability onset date of September 1, 2001. (R. 39, 232) Kroll alleged he was disabled due to "lower lumbar strain and neck strain and can't read or write." (*See* R. 65) His applications were denied initially on May 31, 2002 (R. 26, 28-31). Kroll filed a request for reconsideration on June 17, 2002. (R. 32) His applications were denied upon reconsideration on August 28, 2002. (R. 27, 33-36, 236)

On September 16, 2002, Kroll requested a hearing (R. 37), and a hearing was held before ALJ Andrew Palestini on November 4, 2003, in Sioux City, Iowa. (R. 240-71) Kroll was represented at the hearing by paralegal Lee Sturgeon.[1] Kroll testified at the hearing, as did Vocational Expert ("VE") William Tucker.

On April 23, 2004, the ALJ ruled Kroll was not entitled to benefits. (R. 9-20) Kroll appealed the ALJ's ruling, and on July 14, 2004, the Appeals Council denied

---

[1]The hearing transcript incorrectly identifies Mr. Sturgeon as an attorney. (R. 240)

Kroll's request for review (R. 5-8), making the ALJ's decision the final decision of the Commissioner.

Kroll filed a timely Complaint in this court on July 23, 2004, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Kroll's claim. Kroll filed a brief supporting his claim on November 8, 2004. (Doc. No. 8) The Commissioner filed a responsive brief on January 10, 2005 (Doc. No. 11).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Kroll's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Kroll's hearing testimony

At the time of the hearing, Kroll was forty-three years old. He was about 5'7" tall and weighed around 180 pounds. He was living in Chatsworth, Iowa, with his wife of twenty years and their two children. (R. 243-44, 263) Kroll finished the "[s]ixth or seventh grade" in school, and he had never had any further education or trade courses. (R. 243, 262) He was in special education all through his schooling due to learning disabilities. (R. 258; *see* R. 115-21)

At the hearing, Kroll stated he has never taken care of his family's financial matters, such as bill paying or maintaining a checking account. (R. 265) In a Daily Activities Questionnaire completed on July 25, 2002, Kroll indicated his wife handles all bills and money. (R. 105) However, in a similar report completed on October 12, 2002,

he indicated he is "able to pay bills and manage money." (R. 83) In addition, Kroll told a consulting psychologist he managed his own money. (R. 154)

Kroll hated school, and he left school to farm full-time when his father had a heart attack. (R. 262) Kroll explained that he worked one farm and his father worked another farm. His mother did all of the book work for both farms. They had stock cows, raised hogs, and raised crops. Kroll's father made the decisions about buying and selling livestock, what to grow, when to plant, whether to keep or sell the crops, and the like. After Kroll's father died, his brother took over their father's farm. Kroll lost his own farm when he filed bankruptcy. Kroll never made a living from his farm; he had always worked at another job even when he had the farm. (R. 263-65)

Kroll obtained his driver's license when he was in his twenties. He had tried to get a license sooner, but he could not pass the written portion of the test. His family helped him study for the test so he could pass. When he took the test, someone read the questions to him. (*Id.*)

Kroll last worked on September 1, 2001, when he fell, injuring his back and neck, and scraping his arm and leg. He saw a chiropractor but his condition continued to worsen. (R. 244) According to Kroll, his employer sent him to see J. Michael Donohue, M.D. at Back Care, Inc.. (R. 245; *see* R. 140-51) Kroll stated Dr. Donohue had restricted him to "light work or something like that." (R. 245)

At the time of his accident, Kroll was working at Diamond Pork as a Breeding Manager. He worked at Diamond Pork from January 1, 2001, until September 16, 2001. (R. 57, 66, 74) In Diamond Pork's hog-breeding business, Kroll was "constantly moving hogs around . . . ear-tagging all the time. Washing." (R. 265) He speculated that his accident could have been caused by light-headedness from "gas that comes off the dunes that are underneath the building itself." (*Id.*) He stated at the time of his accident, one

of the fans was down, and when the air was not moving enough, he could get lightheaded. (*Id.*)

After the September 1, 2001, accident, Kroll took two days off work, and then he returned to work until September 16, 2001, when, according to Kroll, his doctor took him off work. (R. 57-58) Kroll's employer indicated he was a very good worker when he was under supervision, but his attitude, motivation, and work performance would decrease as supervision lessened. (R. 74-75) In addition, the employer stated Kroll "would lose organizational skills during stressful times." (R. 74) The employer indicated Kroll had a good ability to understand and carry out simple instructions and procedures, adhere to schedules and maintain regular attendance, and relate to coworkers. He had adequate work quality, quantity, and pace, and an adequate ability to understand and carry out complex or detailed instructions and procedures, concentrate and remain on task, adapt to changes in the workplace, follow rules, use good judgment, and relate to the public. He had a poor ability to relate to supervisors, manage workplace stress, and manage personal stress while in the workplace, and his appearance was "a bit sloppy." (*Id.*)

According to the employer, Kroll's employment ended because his injury would not allow him to complete tasks. They would hire Kroll back if they "had a position where he could be adequately supervised." (R. 75)

Before he worked at Diamond Pork, Kroll worked at two other pork producers from August 1995 until January 2000, caring for hogs. (R. 656, 122) From 1991 to 1995, he worked as a farm laborer, driving trucks and tractors, tending animals, and working in the fields. (*Id.*) Prior to 1991, Kroll worked as a dump truck driver. (R. 122) Kroll performed the hog care and farming jobs as heavy work, and the dump truck driver as very heavy work. As a dump truck driver, he had to lift rebar and sheets of steel that weighed anywhere from 150 to 250 pounds. (R. 339-41) According to Kroll, he could

drive a truck with a regular driver's license in South Dakota, but in Iowa, he would have to have a chauffeur's license. He failed the test for a chauffeur's license twice. (R. 263)

Kroll indicated he tried to go back to work after his injury but he "started having more problems." (R. 247) According to Kroll, two of his former employers did not even want him on their property for insurance reasons. (*Id.*)

At the hearing, which was some twenty-six months after his injury, Kroll estimated he could lift and carry two gallons of milk, but not very often because his back would "give out" and he would fall. (R. 247-48) He stated when his back gives out, he will feel a sharp, stabbing pain in his tailbone that is almost paralyzing, and then he will fall down. He indicated doctors were continuing to run tests in an attempt to determine the cause for the problem. (R. 248-49)

Kroll stated he usually could stay on his feet up to an hour at a time, but sometimes not that long. He described an incident where he and his brother went to a farm show and after they had walked around for about half an hour, Kroll had to sit down and rest. When he had rested, they walked out to their car and he fell "right down on [his] knees" and skinned his knees. (R. 249) He indicated he has no advance warning; one minute he will be standing and the next he will be on the ground. (*Id.*) Similarly, he indicated some mornings he will get up and feel great, but the next morning could be "a total opposite." (R. 250) On average, though, he opined he could stand for a couple of hours at a time. (*Id.*) He opined he could sit for about an hour at a time before he would have to shift his position to "take the pressure off one side." (*Id.*) The length of time he can sit depends on the type of chair. (*Id.*)

Kroll stated he has trouble sleeping, and he gets up and down during the night. He likened his pain to a toothache, stating he never knows when it will come back. (R. 251)

Kroll indicated he helps his wife wash dishes, and he can sit in a chair while he dries the dishes. He is unable to read or write, and he lacks the patience to sit down and put a puzzle together. He can add and subtract a bit. He stated he had to stop driving a dump truck when the Department of Transportation passed regulations requiring drivers to keep a log book if they drove more than 100 miles from home. He is unable to keep a log book. (R. 251-53) He is unable to follow written directions, he cannot look up a number in the phone book, and when he buys something, he "put[s] his trust into the cash register" as far as how much change he should get back. (R. 254)

Kroll started seeing doctors at a community health center because, according to Kroll, his former employer was not paying his medical bills any longer and he has no health insurance. He indicated he has been depressed and suicidal because he longer has the ability to support his family and because of his ongoing pain. He is taking Zoloft for depression. He takes Ibuprofen 800 mg, and sometimes other medications, for pain. He stated the pain pills helped some, but his pain remains constant, even when he is not on his feet or doing other activities. The pain medication just makes the pain less sharp. (R. 255-56) On a scale of 1 to 10, he rates his pain at a 7 or 8 "[j]ust climbing out of bed, going to the bathroom[.]" (R. 256) He takes pain medication immediately upon arising in the morning, and then again in the afternoon. According to Kroll, his doctors have told him to take his pain medication regularly, even if he is not feeling pain, to maintain an adequate level of medication in his system. (R. 256-57) Activity sometimes aggravates the pain, but the worst it ever gets is an 8 on a 10-point scale. (R. 257)

Kroll indicated he was scheduled for an EEG test three days after the hearing, to determine if he might be having seizures. He stated he will have spells when he blacks out for no apparent reason. He has had the spells for several years, including once or twice a week during the month prior to the hearing. He described one occasion when he

fell off the toilet and his wife found him lying unconscious on the bathroom floor. He did not go to the hospital, but later told his doctors about it. He stated that when he regained consciousness, he had a headache. (R. 258-59, 268-69) He stated he gets headaches frequently. He suggested the headaches could be caused by a "spur" in his neck, or "a couple of concussions through the years," or because his father hit him in the head a lot when he was a child, and he stated his doctors "don't know if it's like a blood clot doing this." (R. 259-60, 269) According to Kroll, the doctors scheduled the EEG in an attempt to determine the cause of his headaches.

Kroll received an epidural injection in his low back from Dr. Cook at 9:00 a.m. on the morning of the hearing. He stated this was his second injection, and "[t]hey can only do it three times." (R. 260) He indicated the injections relieve his pain for a couple of days. He also stated he gets pains down his leg that make it difficult for him to sleep, and the injection also helps somewhat with his leg pain, allowing him to sleep better for a night or two. (R. 261)

According to Kroll, he saw a surgeon who indicated he could perform surgery on Kroll, but he could not offer Kroll any guarantee of improvement, and the surgery could make things worse because Kroll has "a lot of arthritis in this." (R. 261)

## 2. *Kroll's medica history*

As noted previously, Kroll claims he is disabled due to lower lumbar strain and neck strain. (R. 65) Kroll saw Roy D. Lubkeman, D.C. for chiropractic adjustments until October 19, 2001. As of that date, Kroll had mild pain, spasm, tenderness, and edema in his lower back area on the right side. Dr. Lubkeman noted "that on at least one occasion, [he] had to warn Mr. Kroll about doing too much work at home and potentially re-injuring the spine, prolonging his treatment." (R. 126)

On October 22, 2001, Kroll saw J. Michael Donohue, M.D. at the request of Kroll's insurance carrier for evaluation of complaints of low back pain, bilateral hip discomfort, and shoulder discomfort radiating into his neck with associated headaches. Kroll gave the following history of his injury:

> [Kroll] dates the onset of his discomfort to 9/1/01. He relates that while employed as a hog-breeding manager, he was utilizing a water hose to clean out a hog unit sewer. He relates he was pulling on the hose when it gave way and he fell backwards striking his back against a crate. He relates he reported pain in his back and neck at that juncture. He has been receiving chiropractic treatment from a Dr. Roy [Lubkeman] in Hawarden since that time. He was initially held off work for a week. He was returned to modified duty on 9/10/01 and relates that he worked two to three days before noting increasing symptoms. He had an aggravation of his condition when he was knocked by a heavy sow. He has been off work since 9/14/01. . . . When questioned, he relates that his primary area of symptoms is his neck and associated headaches followed by severe pain in the lower back.
>
> He rates his back discomfort as a level 9 on a scale of 10. He is having pain on a daily basis and he feels that it is worsening. He has intermittent numbness in his legs. He is limited to walking short distances. When questioned, he relates that he has the most significant pain when he first gets up in the morning and is walking barefoot. He denies any bowel or bladder incontinence. The pain does awaken him at nighttime.
>
> At this time, his pain is aggravated by standing, walking, sitting, driving, bending, lifting, getting up from a chair, coughing, and sneezing.

(R. 149)

Dr. Donohue's examination revealed no significant limitation in the range of motion of Kroll's neck, although Kroll expressed discomfort in moving his neck. He had

full range of motion in his shoulders, intact sensation of the upper extremities, and good deep tendon reflexes and strength in his muscles. He had no palpable spasm in his neck, but he expressed pain upon palpation along the cervical musculature. He also complained of mild back pain with torso rotation, and cervical pain with cervical compression. He exhibited tenderness along the lumbosacral junction. He could forward flex 90 degrees, lateral flex 30 degrees in each direction, and hyperextend 30 degrees. (R. 150)

Dr. Donohue diagnosed Kroll with a soft tissue injury to his neck and lower back with residual symptoms seven weeks after the injury. He recommended "a more aggressive rehabilitation program," including physical therapy three times weekly for six to eight weeks, with addition of lumbar strengthening exercises as he progressed through the program. The doctor stressed to Kroll the importance of regular attendance and maximal effort. He noted Kroll likely would have increased symptoms early in his rehabilitation, so he kept Kroll off work for two weeks until his next follow-up appointment. (R. 151)

Dr. Donohue saw Kroll for follow-up on November 5, 2001, after Kroll had been to seven rehabilitation sessions. Kroll indicated he was improving. Examination revealed his strength values continued to fall below normal in all parameters. Dr. Donohue reviewed X-rays taken of Kroll's lumbar spine on September 4, 2001. He noted "mild wedging of the superior endplate of T12 which appears to be a chronic condition," and "mild narrowing of the L5-S1 disc space," but no acute changes, fractures, or bony lesions. The doctor's assessment was, "post neck, left shoulder, and lumbar injuries with documented deconditioning." (R. 148) He directed Kroll to continue with the aggressive rehabilitation program, estimating his treatment would last approximately eight weeks. He indicated Kroll could return to work if modified duty was available, but Kroll stated his boss would require him to be released for full duty. Dr. Donohue gave Kroll the

following restrictions for work: ten-pound lifting restriction, ability to sit or stand as needed; no repetitive bending, lifting, or twisting; and use of upper extremities limited to chest level or below.  (*Id.*)

Kroll saw Dr. Donohue for follow-up on November 19, 2001, after four weeks of rehabilitation.  Kroll stated he was doing quite well with respect to his low back and hip discomfort.  He continued to have left shoulder discomfort, although this was improving.  Upon examination, Kroll exhibited full range of motion in both shoulders, with some tenderness.  Dr. Donohue noted significant gains in Kroll's condition, "although he remain[ed] moderately below normal levels with respect to left shoulder girdle musculature and slightly below normal with respect to cervical and lumbar test strength tested isometrically."  (R. 147)  The doctor noted Kroll's employer had not allowed him to return to modified duty.  He continued Kroll's work restrictions, and directed him to return in two weeks.  (*Id.*)

Kroll saw Dr. Donohue again on December 3, 2001, following six weeks of aggressive rehabilitation.  His neck and back were doing quite well, but he continued to complain of pain in his left shoulder.  Dr. Donohue administered a subacromial injection on the left.  He directed Kroll to continue with rehabilitation three times weekly, and return for follow-up in two weeks.  He continued Kroll's work restrictions without change. (R. 146)

When Kroll saw Dr. Donohue again on December 17, 2001, Kroll estimated he had achieved "a 50% improvement in his low back pain, 30% improvement in his hip discomfort, 50% improvement in his shoulder pain, and 70% improvement in his headaches.  Overall he [felt] 50% to 60% improved."  (R. 145)  Dr. Donohue noted Kroll's "strength data demonstrate[d] near normalization of his cervical extension strength with a slight drop-off at full flexion.  Lumbar isometric strength [had] normalized.

Shoulder strength overall [had] progressed with some mild residual deficits." (*Id.*) The doctor found that Kroll exhibited "fair subjective and good objective response to aggressive rehabilitation." (*Id.*) Kroll indicated he still did not believe he could return to full work duties, for example expressing doubt that he could "perform activities such as pulling dead sows." (*Id.*) Dr. Donohue scheduled a Functional Capacity Evaluation for Kroll, and in the interim, continued his work restrictions without change. (*Id.*)

Marcus M. Witter, P.T. performed a Functional Capacity Evaluation ("FCE") on December 26, 2001. He found Kroll could return to light-medium work with lifting restrictions of thirty-five pounds occasionally, fifteen pounds frequently, and seven pounds constantly. He opined Kroll could stand or walk constantly; sit, bend, reach, squat, kneel, or climb frequently; and crawl occasionally. He could operate light arm and foot controls, but could not balance. He could perform simple grasping, fine work, pushing/pulling, and low-speed assembly with either hand. (R. 125; *see* R. 144)

When Kroll saw Dr. Donohue on December 26, 2001, to review the FCE, Kroll complained of increasing headaches, and back discomfort with driving or prolonged sitting. Dr. Donohue encouraged Kroll "to work on his home exercise program to address these residual symptoms." (R. 144) The doctor reviewed the FCE with Kroll, and recommended Kroll "present his restrictions to his employer to see if they could be accommodated on a long-term basis." (*Id.*) The doctor indicated if Kroll's restrictions could not be accommodated by his employer, then "a job search should be instituted." (*Id.*) He directed Kroll to return for follow-up in four weeks for repeat X-rays to assess his progress and his compliance with the home program. (*Id.*)

Kroll saw Dr. Donohue on January 28, 2002. He reported his employer was not able to offer him a position with his work restrictions, and he was assigned to a rehabilitation specialist. Kroll reported ongoing moderate problems with headaches and

back discomfort. He stated he was working on his home program. Examination revealed Kroll had maintained his previous strength results compared to six weeks earlier, but he had a slight drop-off in his lumbar strength values. Dr. Donohue recommended an MRI of Kroll's cervical and lumbar spine to assess his residual symptoms and "to rule out any type of surgical lesion or problems that may respond to an epidural injection." (R. 143) He encouraged Kroll to work with the rehabilitation specialist on vocational rehabilitation options, noting the restrictions assigned in the December 26, 2001, FCE likely would be permanent in nature. (*Id.*)

Kroll and his wife saw Dr. Donohue on February 11, 2002, to review the MRI scans of his cervical and lumbar spine. Dr. Donohue noted the studies did not show any type of surgical lesion or area that was likely to respond to an epidural injection. Kroll stated he continued to have neck pain associated with headaches, as well as lower back pain. He stated he was working with the rehabilitation specialist on vocational options. Dr. Donohue recommended Kroll continue with his home exercise program, and return for final evaluation in six weeks. (R. 142)

Dr. Donohue saw Kroll for final evaluation on March 21, 2002. Kroll reported he had not returned to work, and he was still working with the rehabilitation specialist. He indicated some jobs had come up, but either they were too far away from his residence or he could not pass the physical examination for the jobs. He indicated he had applied for Social Security Disability and there was "litigation pending concerning his injuries." (R. 140) Kroll stated his primary concern was his lower back pain. He indicated his neck still bothered him intermittently, and he reported occasional discomfort in his left shoulder, but his primary limitation related to his lower back. After a full examination, Dr. Donohue indicated Kroll had reached maximum medical improvement with respect to his injury of September 1, 2001. His only recommendation for continued treatment

was that Kroll continue with his home exercise program, and work within his FCE recommendations, which Dr. Donohue considered to be permanent restrictions. He awarded Kroll a 5% impairment of his cervical spine and 5% impairment of his lumbar spine "based on degenerative changes noted on his MRI scan." (R. 141) However, Dr. Donohue found the degenerative changes to be a pre-existing condition, not related to Kroll's September 1, 2001, injury. (*Id.*)

On April 29, 2002, Denise Marandola, Ph.D. examined Kroll for purposes of performing a psychological assessment at the request of Disability Determination Services. (R. 152-55) Dr. Marandola administered the WAIS-III Psychodiagnostic Disability Assessment test. The doctor noted Kroll appeared for the interview with poor hygiene and body odor, wearing dirty jeans. He "walked with an awkward and wide gait due to back pain," and he stated he had trouble sitting sometimes. He discussed problems sleeping, irritability due to frustration of not being able to be as active as before the injury, and problems with attention, concentration and decision-making, although he indicated his decision-making was improving. She found his thought processes to be logical, coherent, and goal-directed. Regarding his daily activities, Kroll reported he was able to drive, help with cooking and cleaning, shop independently, and manage his own money. He stated his wife also had back problems, so they would alternate and take turns standing to do household tasks. (R. 153-54)

Dr. Marandola noted that during the testing, Kroll "put forth good effort and the results are believed to be a valid reflection of his true ability." (R. 154) She noted Kroll "seemed to process slowly, but this appeared to help him avoid impulsive errors." (*Id.*) Kroll's "performance on the WAIS-III resulted in a Full Scale IQ score of 69, which falls in the Mildly Mentally Retarded range and at the 2nd percentile." (*Id.*) Kroll was limited equally at both verbal or academic-type tasks and at performance or non-verbal

skill areas; however, his Performance IQ score of 76 was in the Borderline range, while his Verbal IQ score of 67 was in the Mildly Mentally Retarded range. (*Id.*)

Dr. Marandola reached the following conclusions from her testing of Kroll:

1.    Mental Status:
      Axis I: Adjustment Disorder with mixed disturbance of emotions and conduct
      Axis II: Mild Mental Retardation
      Axis III: Chronic lower back and neck pain, post-injury
      Axis IV: Financial insecurity, unemployment, lack of education, lack of job skills
      Axis V: Current GAF = 62[2]

2.    As far as his ability to remember and understand instruction, procedures and locations, [Kroll] would function in the Mildly Mentally Retarded to Borderline range as inferred by scores on the WAIS-III.

3.    As far as ability to carry out instructions, maintain concentration and pace, his attention and concentration were poor to fair during this evaluation. Pace of processing was particularly slow.

4.    As far as ability to interact appropriately with supervisors, co-workers, and the public, he was social and cooperative. He appears to be capable of interacting appropriately with supervisors and co-workers in labor-intensive positions; however, vocabulary is poor, hygiene is poor and he has spent most of his life in laboring jobs that have not required social skills.

5.    As far as ability to use good judgment and respond appropriately to changes in the work place, he appears to be able to use good judgment in farm or industrial environments, but he has not been in a position to have to interact with the public

_____

[2]A Global Assessment of Functioning rating of 62 indicates mild symptoms or some difficulty with social and occupational functioning. *See* American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

and judgment in such a setting is questionable, based upon his recent charge of domestic violence and limited education.

6. As far as ability to handle funds, [Kroll] would likely be able to manage his own funds as he has been able to do so in the past, with the help of his wife.

(R. 155)

On May 13, 2002, Charles H. Koons, M.D. reviewed Kroll's records and completed a Physical Residual Function Capacity Assessment form (R. 156-64). He opined Kroll could lift thirty-five pounds occasionally and fifteen pounds frequently; stand, walk, or sit, with normal breaks, for a total of about six hours in an eight-hour workday; and push/pull without limitation. He opined Kroll occasionally could crawl, and frequently could climb, balance, stoop, kneel, and crouch. He found Kroll to have no manipulative, visual, communicative, or environmental limitations. (*Id.*) Dr. Koons found Kroll's allegations "to be rather magnified over the limitations placed on him by Dr. Donohue who is listed as a back care specialist, thus eroding his allegations to some degree." (R. 164) On August 27, 2002, J.D. Wilson, M.D. reviewed the file and affirmed Dr. Koons's assessment. (R. 163)

On May 27, 2002, Philip R. Laughlin, Ph.D. reviewed Kroll's records and completed a Mental Residual Functional Capacity Assessment form (R. 165-167), and a Psychiatric Review Technique form (R. 168-79). Dr. Laughlin found Kroll to have severe mental impairments consisting of an adjustment disorder with mixed disturbance of emotions and conduct, and borderline intellectual functioning, but he found the impairments did not meet or equal the Listing criteria. He found Kroll's allegations to be credible to the extent his limitations equaled Dr. Laughlin's assessment. He noted Kroll "does manifest moderate limitations of function with understanding and memory, social interaction, sustained pace, concentration and persistence, and adaptation/executive

functioning. There have not been significant episodes of deterioration that cause [Kroll] to withdraw or experience exacerbation of signs and symptoms that include deterioration of adaptive behaviors related to psychological factors." (R. 180-81) On August 27, 2002, David A. Christiansen, Ph.D. reviewed Dr. Laughlin's assessment and concurred in his conclusions. (R. 168)

On January 10, 2003, Kroll began seeing Physician's Assistant Randy Guerdet at Siouxland Community Health Center ("SCHC"), in connection with his low back pain. Kroll stated his low back pain was worsening and he was having numbness in his right buttock extending down to his toes, mostly on the right but occasionally on the left. He reported some relief from aspirin, and he also was taking Ibuprofen when the pain was "really bad." (R. 214) He stated he suffered from anxiety and depression which had never been treated. He reported migraines, for which he took aspirin or "applied a cold gel pack with some relief." (*Id.*) Kroll reported smoking three packs of cigarettes daily for twenty years. (*Id.*)

Regarding his current symptoms, Kroll reported a weight change of more than five pounds, night sweats and fatigue, vision problems, difficulty swallowing; epigastric pain during the night, relieved with milk; diarrhea a couple of times per week; occasional dysuria and slow urinary stream; "thoughts of suicide, but no plan"; and feeling "sad a lot of the time and . .. some difficulty with insomnia." (*Id.*) Upon examination, Kroll could forward flex to within six inches of the floor with some bending of the knees, but he complained of pain with the maneuver. Back extension was 30 degrees, and lateral flexion was 45 degrees bilaterally. Straight-leg-raising was positive at about 30 degrees on the right and 45 degrees on the left. P.A. Guerdet diagnosed Kroll with low back pain with radiculopathy, depression, tobacco abuse, "[p]oor social, situation with unemployment and lack of finances"; and "[m]ultiple relatives with cardiovascular

disease." (R. 215) He started Kroll on Naprosyn for pain, and discussed smoking cessation with him. He obtained releases for Kroll's prior medical records, and directed Kroll to return for follow-up in one month. (*Id.*)

At the January 10, 2003, visit, P.A. Guerdet had Kroll visit with a social worker. Kroll reported having trouble falling or staying asleep, or sleeping too much, more than half the days; and having the following symptoms nearly every day: feeling down, depressed, or hopeless; having little interest or pleasure in doing things; feeling tired or having little energy; feeling bad about himself, or that he was a failure or had let his family down; and having trouble concentrating on things, such as reading the newspaper or watching television. He indicated these problems had made it very difficult for him to work, take care of things at home, or get along with people. The social worker assessed Kroll's depression as severe. (R. 216) Kroll was willing to try an antidepressant, and P.A. Guerdet prescribed a trial of Elavil. (R. 208, 215) The social worker encouraged Kroll to obtain counseling, but he indicated he could not do so because of his residence location. (R. 208)

Kroll returned to see P.A. Guerdet on January 31, 2003. He reported the Elavil sometimes made him feel "drugged in the morning," but other mornings he felt "like a million dollars." (R. 213) He reported ongoing lower back pain with radiation, right more than left, and he also complained of some headaches and congestion. P.A. Guerdet continued the Elavil and Naprosyn, and directed Kroll to return in one month. (*Id.*)

At his next follow-up on February 28, 2003, Kroll reported his depression was better at times. He complained of almost-daily headaches, and back pain that he rated as 8 to 10 on a 10-point scale. (*Id.*) Examination revealed fairly good range of motion in Kroll's neck with some tightness. When pressure was applied to his head, he reported feeling low back pain. He described an incident the previous evening when he was

watching television. He stated he "developed some sudden pain of his neck coming around to the right side of his face and up into his head that lasted for about a half hour." (R. 212) P.A. Guerdet opined Kroll's headaches could be related to the cervical degenerative joint disease that was shown on an MRI from February 2002. He again prescribed Naprosyn, and continued the Elavil. (*Id.*)

Kroll returned to see P.A. Guerdet on April 28, 2003. He rated his neck pain at 10 and his back pain at 7 on a 10-point scale. (*Id.*) Kroll reported increased neck pain, which he stated had become unbearable over the previous month or two. He complained of some numbness and tingling in both arms, right more than left, and stated he had almost dropped a cup of tea. He reported some problems with balance, and stated he heard some crackling sounds when he turned his neck. Regarding his depression, Kroll stated his mood was better, he was sleeping better at night on the Elavil, and he was "trying to joke and be upbeat about things." (R. 209) P.A. Guerdet noted Kroll's affect was "somewhat up," he was "very descriptive and conversant," and he smiled at times. (*Id.*) Because of Kroll's increasing pain, P.A. Guerdet ordered another MRI of Kroll's cervical spine, and referred him to Thomas J. Clark, D.O. for an evaluation of the paresthesias. (*Id.*; *see* R. 184-85)

An MRI study of Kroll's cervical spine was performed on April 29, 2003. The study showed "mild degenerative disc disease with small posterior disc osteophytes" at the C6-7 level, but otherwise was a normal study. (R. 219; *see* R. 185)

Kroll returned to see P.A. Guerdet on May 12, 2003, for follow-up after his MRI. Kroll reported "a lot of problems with headaches," and "some 'shakes.'" (R. 206) The P.A. continued Kroll's prescription for Naprosyn. P.A. Guerdet suggested a possible referral to Iowa City if Kroll was turned down for Social Security benefits. (*Id.*) Kroll again spoke with a social worker, reporting he still was having suicidal thoughts but had

no suicide plan. He stated his children might be better off if he were dead. Kroll agreed to try counseling, and P.A. Guerdet started Kroll on Zoloft. (R. 206, 207-08)

On May 20, 2003, Kroll saw Philip Muller, D.O. for counseling. Kroll reported being in chronic pain since his September 2001 accident. He stated he had been turned down for disability, and workmen's compensation would not pay his medical bills. He reported that he had been depressed for over a year and he was having suicidal thoughts daily. He told Dr. Muller he had both the means and a plan to commit suicide, but he would not tell the doctor any details. During the therapy session, Kroll promised his wife that he would keep himself safe for a week. His wife stated Kroll "is a man of his word," and she believed he would keep his promise. The doctor noted no follow-up appointment was made because it was a hardship for Kroll to get to the clinic, but the doctor planned to follow up with Kroll by telephone in one week. (R. 204)

Kroll also saw Dr. Clark on May 20, 2003, upon referral from P.A. Guerdet. The doctor's examination of Kroll revealed full cervical range of motion, with tenderness to palpation over the base of the occiput; negative straight-leg-raising in the seated and supine positions; intact motor strength in all four limbs; normal sensory examination; and mildly diminished range of motion in the lumbar spine. Dr. Clark's impressions were, "Neck and low back pain, secondary to trauma. Clinical findings suggest a facet arthropathy and deconditioning as the primary source of pain"; and "Normal neurologic examination." (R. 203) Dr. Clark recommended the following for Kroll's further care and treatment:

> The patient needs aggressive physical therapy and anti-inflammatory meds, as well as an active exercise program and probable smoking cessation program. It was brought to my attention subsequently, that he had expressed suicidal ideation. This will be deferred for evaluation by his family physician. This needs to be addressed immediately.

> Nonetheless, we will help him in any way to get him back
> into working condition. His persistent symptoms over the
> past two years are the direct result of the injury sustained on
> the job in September of 2001. I question whether he had
> appropriate treatment and noting that back care and physical
> therapy was discontinued when Back Care shut their doors and
> left in 2001.

(*Id.*)

On June 6, 2003, Dr. Muller spoke with Kroll's wife. She advised that Kroll's depression had been worse lately, and Kroll was lethargic and sleeping all the time. Kroll still was not interested in counseling but his wife indicated she would talk to him about it again. She stated she and Kroll were coming in to speak to Kroll's primary care physician. (R. 204)

On June 9, 2003, Kroll returned to see P.A. Guerdet. Kroll reported worsened cervical pain, stating he could not "take it much longer." (R. 200) He also reported increased symptoms of depression, stating he had crying spells two or three times weekly, and daily thoughts of harming himself. He stated he worried a lot about whether he would be approved for disability, and if not, how he would support his wife and two daughters. Upon physical examination, Kroll exhibited good flexion and extension of his neck, and fairly good lateral rotation to the right and left with some stiffness. P.A. Guerdet continued Kroll's Zoloft and other medications, adding Ibuprofen 800 mg. (*Id.*) He wrote Kroll a prescription for physical therapy evaluation and treatment of Kroll's cervical pain. (R. 202)

Kroll saw P.A. Guerdet again on July 7, 2003. He reported continued severe pain in his neck. He stated he had begun having problems riding in the car, with pain "shooting up his spine." (R. 199) He stated he tried to alternate sitting on one side or the other to get some relief from the pain. He stated he rarely drove, but he did

sometimes because his wife did not like to drive.  Kroll also reported worsening symptoms of depression, "talking in detail about his suicidal and homicidal thoughts." (*Id.*)  He was tearful during the interview, "almost to the point of sobbing" at one point. P.A. Guerdet noted Kroll's "thoughts are occupied by his pain, economic and social situation.  He feels that he is losing more and more and has very little left.  At one point, he said that he had his word and soul, the only two things left."  (*Id.*)  P.A. Guerdet assessed Kroll as having major depression.  He had Kroll sign a contract that he would not harm himself or others, and scheduled an appointment for him to see a doctor the next day to be assessed for possible hospitalization.  (*Id.*)

On July 8, 2003, Kroll saw Kristi D. Walz, M.D. at Mercy Medical Center.  Kroll complained of suicidal thoughts and indicated a willingness to be hospitalized.  He was admitted to the Psychiatric ward, with a plan to increase his Zoloft, "keep him at a safe place," and follow his progress.  (R. 186-87)  Dr. Muller also saw Kroll to evaluate him for hospitalization.  (R. 204, 198)  Kroll stated he was extremely sad and depressed.  He indicated he was suicidal, and he had "many plans to carry it out."  (R. 204)  He stated he did not trust himself to be left alone.  He reported hearing "many different voices calling out his name and seeing shadows frequently."  (*Id.*)  He reported panic attacks two to three times weekly.  He reported yelling at his children frequently and expressed fear that he would hurt his daughters physically.  The doctor noted Kroll appeared motivated to change and was willing to enter the hospital for treatment.  Dr. Muller observed that Kroll would not make eye contact, he appeared depressed, and he cried during the session.  Kroll was talkative and answered all of the doctor's questions.  Dr. Muller indicated Kroll would be admitted to Mercy Hospital's inpatient behavioral unit. (R. 198)  Notably, no records from Kroll's hospitalization appear in the record.

On July 15, 2003, Kroll saw P.A. Guerdet again "for followup of his hospitalization." (R. 197) He reported feeling much better on the increased Zoloft dosage, although he was having some side effects, including insomnia and jitteriness. He complained of urinary and fecal incontinence, especially when he coughed. The P.A. questioned whether a worsening of Kroll's back condition could be causing the incontinence, and he ordered an MRI of Kroll's back. He gave Kroll Benadryl to use as a sleep aid. (R. 197)

Kroll underwent an MRI of his lumbar spine on July 25, 2003. The study showed "Disc desiccation of the T11-12 and the L5-S1 levels"; at L5-S1, "a small central disc protrusion with associated mild changes of degenerative disc disease . . . [but] no evidence of central canal or foraminal stenosis"; and "L5-S1 mild to moderate degree of facet arthropathy." (R. 218)

When Kroll saw P.A. Guerdet again on August 1, 2003, his depression was improved. He continued to complain of occasional urinary and fecal incontinence. He noted he and his wife were seeing a therapist and their sessions were going well. Upon examination, he exhibited "tenderness to palpation of the sacral area," and some tightness of the hamstrings upon straight leg raising, with pain in his lower back. P.A. Guerdet noted Kroll's case was "difficult because of the lack of finances." (R. 196) Kroll had not gone to physical therapy as prescribed because of lack of finances. The P.A. renewed Kroll's prescriptions for Ibuprofen 800 mg and Zoloft, and directed him to return in one month. (*Id.*)

A social worker also saw Kroll on August 1, 2003, for follow-up of his depression. Kroll reported having good days and bad days. He stated he was seeing a therapist at Plains Area Mental Health. He did not have an appointment scheduled with Dr. Muller. Kroll admitted he still had suicidal thoughts but stated he would not carry them out.

(R. 198)   No records of Kroll's treatment at Plains Area Mental Health appear in the record.

On September 8, 2003, Kroll and his wife saw P.A. Guerdet after Kroll's therapist suggested he be admitted for depression.   Kroll indicated he wanted to talk to the P.A. about it first.   Kroll reported having suicidal thoughts, including whether to shoot himself versus hanging or overdose.   He did not want to be admitted to the hospital and did not feel it was necessary.   Kroll's wife stated all guns had been removed from their house. Kroll reported some trouble sleeping.   "When asked where he would feel safe, he said that he would feel safe at home."   (R. 194)   P.A. Guerdet noted Kroll's rate of speech increased when he described not caring what others thought of his situation, and wanting to stay home and be left alone. P.A. Guerdet obtained a verbal promise from Kroll that he would call the office or the ER, day or night, if his suicidal thoughts reached a level where he felt unsafe.   P.A. Guerdet referred Kroll to a pain management specialist (*see* R. 188), and to a neurosurgeon to evaluate "the disk desiccation of T11-12 and L5-S1." (*Id.*)   He increased Kroll's Elavil from 50 to 75 mg. at night, and increased his Zoloft from 150 mg to 200 mg.   (*Id.*)   P.A. Guerdet noted Kroll was seeing Chidi Ojinnaka at Siouxland Mental Health every week, and he was scheduled to see Dr. Muller on September 23, 2003.   (*Id.*)   No records of Kroll's treatment by Chidi Ojinnaka appear in the record.

P.A. Guerdet saw Kroll again on September 22, 2003.   Kroll reported having an aching pain in his right leg when he tried to go to sleep.   He stated he had to get up and walk around to get rid of the pain.   He noted that if he fell asleep in a chair, he would not have the pain.   Kroll reported seeing Dr. Muller for depression, and the doctor wanted to start him on Risperdal, but Kroll wanted to wait until he saw P.A. Guerdet before beginning a new medication.   P.A. Guerdet noted Kroll's mood was "normal to

being improved today. He is able to laugh and joke. Rate of speech is good. Thought process seems to be clear." (R. 189) The P.A. started him on the Risperdal, continued his Zoloft and Elavil, and had Kroll sign a "No Suicide/No harm Contract." (*See* R. 193) Kroll also saw a social worker on September 22, 2003. He reported that he was very depressed because of constant pain and his inability to work. He indicated he felt worthless because he could not provide for his family. He indicated he would continue seeing his therapist. (R. 191)

There are no records from Kroll's appointments with either the pain management specialist or the neurologist. The only further record of Kroll's medical treatment is a report from "a 26-channel electroencephalogram" administered on November 7, 2003. The EEG was normal. (R. 227)

### 3.  *Vocational expert's testimony*

The ALJ asked the following hypothetical question of VE William Tucker:

> I'd like the vocational expert to initially consider what effect it would have on the claimant's ability to perform work if initially I found that he was limited to 35 lbs. occasional lifting, 15 lbs. frequent lifting. Could stand 2/3 to 3/3 of the day, which is six to eight hours. Could sit 1/3 to 2/3 of a day. Could occasionally to frequently bend, squat, crawl, or climb. Could use light arm controls. Could do low speed assembly. Would be limited to simple, routine, repetitive work, nothing more complex than he had done in the past. Work should not involve any reading, writing, or math as part of the job duties. No stressful work. And he might require some supervision to be sure he was on-task. With those limitations, could he return to any of his past relevant work?

(R. 287) The VE responded that with those limitations, the claimant could not return to any of Kroll's past relevant work. (*Id.*)

The ALJ then asked, given Kroll's younger age and marginal education, whether there were any unskilled jobs he could perform.  The VE opined Kroll could perform work at the light level including laundry folder, cannery worker, and assembly worker. (R. 268)

The ALJ then asked if Kroll still could perform those light jobs if he could stand for only one-half hour to two hours before having to sit for awhile before returning to standing.  The VE responded that Kroll still could work as a production assembler or laundry folder, but the cannery job would be eliminated because it likely would involve continuous standing.  (*Id.*)

Kroll's representative asked the VE if his response would be the same if the claimant "additionally suffered from an adjustment disorder with mixed disturbance of emotions and conduct, mild mental retardation, and as a result his ability to maintain concentration and pace, attention and concentration are poor to fair."  (R. 270)  The VE responded:

> I guess I don't know.  We're dealing with the lowest level of entry-type employment that we can identify.  The level of concentration required is not very high, but the person would have to be able to stay on-task.  And I guess I really don't know what "poor" and "fair" means in this context.

(*Id.*)  The ALJ defined "poor" as never able to maintain attention and concentration, and "fair" as able to maintain attention and concentration for about one-third of the time. Under those conditions, the VE stated the claimant would be unable to maintain competitive employment.  (*Id.*)

## 4. *The ALJ's decision*

The ALJ found Kroll had not engaged in substantial gainful activity since his alleged disability onset date of September 1, 2001. (R. 12) In assessing Kroll's mental limitations, the ALJ agreed with Dr. Laughlin's assessment, finding that Kroll's "borderline intellectual functioning and adjustment disorder mildly restrict activities of daily living, cause moderate limitations in maintaining social functioning, and cause moderate deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." (R. 15)

The ALJ found Kroll to have "disorders of the back, discogenic and degenerative, and an organic mental disorder, borderline intellectual functioning, impairments which cause significant vocationally relevant limitations." (*Id.*) However, he found Kroll's impairments did not meet the Listing criteria. (*Id.*)

The ALJ found Kroll's subjective complaints to be credible only to the extent they indicated an inability to engage in activity exceeding the ALJ's assessment of Kroll's residual functional capacity (R. 16), which the ALJ found to be as follows:

> [Kroll] retains the residual functional capacity to perform the exertional demands of a wide exertional range of light work, or work which with [sic] occasional lifting of 35 pounds and frequent lifting of up to 15 pounds. He can sit 1/3 to 2/3 of a day and stand for a total of 6 to 8 hours in an 8 hour workday. (20 C.F.R. §§ 404.1567 and 416.967). [His] capacity for light work is diminished by significant non-exertional limitations. [He] can only occasionally bend, squat, kneel or climb, and work light arm controls and low speed assembly. He cannot handle stressful work and may need some supervision to stay on his tasks. He cannot do more than the complexity of the work that he previously performed. [He] cannot read, write or do math as a part of his job duties. [His] mental impairments allow him to understand, remember, and carry out simple routine repetitive

>     work-related decisions necessary to function in unskilled
>     work.

(R. 17)

In finding Kroll's subjective complaints regarding his limitations not to be fully credible, the ALJ noted Kroll had reported some improvement in his symptoms from epidural injections, counseling, and medications. As of December 17, 2001, Kroll estimated 50% improvement in his low back and shoulder pain, 30% improvement in hip discomfort, and 70% improvement in his headaches. (R. 16, citing R. 145) Progress notes on September 22, 2003, indicated Kroll's mood had improved to normal, and he could laugh and joke with a clear thought process. (R. 16, citing R. 189) The ALJ also noted Kroll had stopped going to physical therapy due to financial concerns, yet Kroll continued to smoke two packs of cigarettes daily. (R. 16)

The ALJ noted that as of April 29, 2002, Kroll indicated he played with his dogs, went fishing, helped with cooking and cleaning, shopped independently, managed his own money, and drove his car himself. (R. 16, citing R. 153-54) The ALJ found "[t]his level of activity demonstrates a level of vigor and an ability to concentrate and interact with others which is inconsistent with [Kroll's] claim that he is unable to perform any work." (R. 16)

In addition, the ALJ noted Kroll had reported to Dr. Donohue that he had looked for work, and although some jobs were available, they were too far from his residence or he was unable to pass the physical examination. The ALJ noted, "If [Kroll] is able to find a job, it's [sic] distance from his residence is not a disabling condition." (*Id.*)

The ALJ noted Kroll gave a "histrionic presentation of exaggerated symptoms at the hearing," and found his subjective complaints regarding his limitations to be

inconsistent with the reports of treating and examining practitioners and information contained in the medical evidence. (R. 17)

The ALJ found Kroll could not return to any of his past work, and he had no transferable skills from his unskilled and semi-skilled heavy exertion work. However, based on the VE's testimony, the ALJ further found Kroll could perform light-exertion, unskilled work as, for example, a laundry folder, cannery worker, and production assembly worker, each of which jobs exists in significant numbers. (R. 18) The ALJ noted that even considering a hypothetical person who could stand for only one-half to two hours daily, the VE still opined the individual could work as a laundry folder and product assembly worker.[3] (*Id.*)

Because he concluded Kroll could make an adjustment to other work, the ALJ concluded Kroll was not disabled. (*Id.*)

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age,

---

[3]This statement by the ALJ is not indicative of the hypothetical question he posed to the VE. The ALJ asked, "If the claimant's ability to stand varied between one half hour to two hours before he would have to sit for a period before returning to standing, would that affect his ability to perform those lights jobs?"  The ALJ did not pose a hypothetical question that included the limitation of only being able to stand for one-half to two hours "daily."

education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined

at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

### B.  The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th

Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796; *Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not

"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young,* 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may

only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. ANALYSIS

Kroll argues the ALJ failed to evaluate his mental retardation under the correct legal standard, which Kroll cites as Listing 12.05. He argues the ALJ erred from the first step of the sequential evaluation process in failing to find his adjustment disorder to be a medically determinable impairment. The court agrees. The ALJ specifically relied on the opinion of the State agency psychological consultant, Dr. Laughlin, who found Kroll to have severe mental impairments consisting of an adjustment disorder with mixed disturbance of emotions and conduct, and an organic mental disorder consisting of borderline intellectual functioning. (*See* R. 15) Although, in his discussion, the ALJ

noted Kroll's "borderline intellectual functioning and adjustment disorder mildly restrict activities of daily living, cause moderate limitations in maintaining social functioning, and cause moderate deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner[,]" (R. 15), he then failed to include the adjustment disorder in his findings. (*See* R. 19, ¶ 3) The ALJ's finding of "organic mental disorder, borderline intellectual functioning" is only one of the two mental impairments recognized by Dr. Laughlin. (*See* 168-69, 171)

As Kroll notes in his brief (*see* Doc. No. 8 at 5), the omission of the adjustment disorder from the ALJ's findings appears to have been inadvertent. Nevertheless, its omission affected the ALJ's discussion of Kroll's mental impairments because the ALJ discussed his limitations in terms of borderline intellectual functioning, and omitted any discussion of his limitations in terms of the adjustment disorder or "mental retardation."

Kroll goes on to argue, persuasively, that his impairments should have been evaluated under Listing 12.05, *Mental retardation*. He argues the ALJ blithely followed the State agency ruling without noting discrepancies between the ruling and the record. (*See id.* at 7) Specifically, Kroll notes that in failing to apply Listing 12.05C, the State agency relied on the absence of school or other records to show he has been considered mentally retarded since childhood. (*Id.* at 8) Yet, he asserts he provided those school records to the State agency two months before the agency's decision. He further notes, correctly, that the record before the ALJ contains Kroll's school records which do, in fact, substantiate his claim that his verbal IQ scores have been in the Mildly Mentally Retarded range and he was considered to be mildly mentally retarded throughout his childhood. (*See* R. 115-21)

The Commissioner agrees the ALJ should have evaluated Kroll's claim under Listing 12.05, but disagrees that Kroll automatically would qualify as disabled under the

Listing. Thus, the Commissioner argues remand is appropriate to allow reconsideration of Kroll's claim under the Listing. (*See* Doc. No. 11, at 7-10) The court agrees remand would be appropriate for consideration of Kroll's claim under Listing 12.05.

In addition, however, the court finds further errors in the ALJ's consideration of Kroll's claim. Kroll argues, and the court agrees, that the ALJ failed to conduct a proper *Polaski* analysis before discounting Kroll's subjective complaints regarding his limitations. Although the ALJ mentioned *Polaski*, he failed to justify adequately his reasons for discounting Kroll's testimony. In discounting Kroll's subjective complaints, the ALJ pointed to periodic improvement in Kroll's symptoms from epidural injections, counseling, and medications. (*See* R. 16) Yet despite periodic ups and downs in his condition, the evidence indicates Kroll's condition continued to worsen over time, to the point that he became severely depressed and suicidal due to ongoing pain and an inability to work. The court finds particularly disturbing the lack of consideration by the ALJ of the impact of Kroll's ongoing depression on his ability to work, and the absence of medical records from Kroll's mental health providers.

"It is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel[,]" *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985), although it is of some relevance that Kroll's attorney did not obtain the records from Kroll's mental health treatment. *See Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). The relevant question here is "whether medical evidence already in the record provides a sufficient basis for a decision in favor of the Commissioner." *Scott v. Apfel*, 89 F. Supp. 2d 1066, 1076 (N.D. Iowa 2000) (Bennett, C.J.). In considering whether an ALJ has failed to develop the record fully, the relevant inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, we will not remand." *Onstad*, 999 F.2d at 1234

(citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). Although Kroll has not argued, *per se*, that he was prejudiced by the ALJ's failure to develop the record, he has argued the ALJ failed to consider all of the available evidence, and the court finds it was error for the ALJ not to obtain records of Kroll's mental health treatment in evaluating the effect of his mental limitations on his ability to sustain competitive employment.

Kroll also argues the ALJ erred in assessing his physical residual functional capacity. The ALJ noted that as of April 29, 2002, Kroll indicated he played with his dogs, went fishing, helped with cooking and cleaning, shopped independently, managed his own money, and drove his car himself. (R. 16, citing R. 153-54) The ALJ found "[t]his level of activity demonstrates a level of vigor and an ability to concentrate and interact with others which is inconsistent with [Kroll's] claim that he is unable to perform any work." (R. 16) The court fails to see the connection between Kroll's stated activities and his "ability to concentrate and interact with others." In addition, there is no evidence that any of these activities was performed on a regular or sustained basis. "[A]n SSI claimant need not prove that []he is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for [him]self, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991) (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Therefore, the court finds remand is appropriate for the further purpose of a reevaluation of Kroll's physical residual functional capacity.

Upon remand, the Commissioner should be directed to obtain such new consultative evaluations as necessary for a full and proper evaluation of Kroll's mental and physical residual functional capacity, to reconsider his claim in light of that evidence,

and, in particular, to consider his claim under Listing 12.05, in light of all of the evidence of record.

## IV. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, judgment be entered for Kroll, and this matter be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 6th day of April, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. _See_ Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. _See Thomas v. Arn_, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); _Thompson v. Nix_, 897 F.2d 356 (8th Cir. 1990).